May it please the Court, Dennis Fischer, for the petitioner, oh, I'm sorry, Your Honor, is there a case in between that you're calling? This is the- I already called it. Oh, I'm sorry. Yeah. I'm appearing on behalf of the appellant and petitioner, Yun Liao, Yun Liao v. Junious. I wonder if I might, as a personal- Yes. Aside, perhaps Judge Trott does remember me. Of course. Of course. Well, it's only been 48 or 49 years, Your Honor. At least. At least. At least. I have the recollection of your wheeling a trolley into a preliminary hearing with a hundred law books and statutes and feeling very, very small at the time. Now I have an iPad. Then I had to have a truck. Times have changed. Did he come in with his shopping cart? Yes, he did. He did that in a preliminary hearing, Your Honor. You may remember. A Ralph's Safeway? No, no. Are you accompanied by anybody today, Mr. Fischer? I am indeed, and I was going to, perhaps with the suggestion by your visiting judge of his several grandchildren to say that I invited two of mine to witness me for the first time. I thought it was about time that members of my family might see what I do for a living or a non-living. Would you like to introduce them? Well, I would be- Do you want them to sit up at the table? Oh, yes. You want them to sit up here. Oh, that would be lovely. I wonder if that would- Come on. That way they'll be able to see you better. All right. And their names are? They're first seating at council table. The young man is Harrison Fischer-Huber. The young lady is Eden Spalding. Eden has a bigger sister, an older sister by just a year, who appeared in a class play and had to stay at school to appear at her first council meeting, having been elected a secretary of her class on the platform that it's in the jeans, and showing a picture of my 99-year-old mother, who is still going strong, and was class secretary at Roosevelt High. I believe Judge Pragerson may have some connection with that, if I'm not mistaken. Mr. President. Sorry? I was the president. You were the president. Perhaps a few years- Hail to the chief. Hail to the chief, indeed. Well, that's very nice. What year was that? Early 30s. My mother was born in 1916, so it was in the early 30s. She's seven years older than I am. Ah. So she should be 99. She is 99, and hail and hearty. Is she with us? Well, we are hoping that we can show the video of this to her at her residential facility, and she should be able to enjoy that. Good. Now we will proceed to beat you to a pulp. As fully expected, Your Honor. What is your mother's name? My mother's name is Lily Fisher. Lily Fisher. Yes. Hi, Lily. Happy birthday. That's very nice. That's coming up. 100 is coming up on January 11th, and we are looking forward to that. Very soon. With great eagerness. And my father just passed away, but he lived till 98. So they were a couple until just a few months ago, and both very active and mentally sound. It's very nice. Very nice, it is. Thank you. Thank you very much. You know, the federal government, they regulate your life when you're a judge, and you get calendars that tell you when you appear, and it's all randomly done. And so I have this very nice ID card, and it states a lot of information about me, but up in the upper right-hand corner, it has the date I expire. And it's October the 14th, 2024. 2024. Oh, my gosh. 101 then. Well, we can keep the October 14 and put a blank after that, and we expect you to have many more years, Judge Pragerson. Well, that's amazing. I suppose you want to hear a little about this case, perhaps, and perhaps a lot. Oh, this is the sleepwalker. This is the sleepwalker. It's a very unusual take on a very familiar issue. Strickland prejudice is something all of the judges of this court no doubt have visited many times in the past, and yet the application of this is amazing and really novel. The case of Mr. Liao, who it is not disputed, in the middle of the night, picks up a hammer at the side of the bed of the teenage son of the lady he had been seeing for some time but was in the process of breaking up with, hits him, Henry, over the head several times, apparently not in any, certainly in not a lethal fashion. He never spent a night at the hospital, as I recall, and then was confused afterward but did want to, was embarrassed, did want to hide the hammer. So he's presented to the jury on a charge of attempted premeditated murder, an extraordinary charge. I think in the days that I was a young public defender opposing Judge Trott, we used to call those 217s, but this would have been an old ADW. I don't know if any of those letters mean anything to the floor of the bench, or GBI. Great bodily injury. Great bodily injury. Assault with a deadly weapon. Yes. 245, take your choice. You've got it. Yes, you haven't forgotten. 217. That's it. That's it. Well, these days attempted premeditated murder is an extraordinarily serious charge, and the defense to it by an attorney, a former colleague of yours in DA's office, who had been a defense lawyer for some time, was to consult a sleep study expert at Stanford, the right place to go, and his expert said, I need to... What's the name of the attorney? Lawrence Donahue. Oh, Donahue. Yes, and Donahue is a familiar name because his former wife may still be a deputy DA, but was for a long time very active in the office. It's very interesting because apparently there was a court order that a sleep study should be performed. Am I right about that? It is correct. And I also seem to remember that the prosecutor kind of agreed with that at the time. No, not at the time. The prosecutor was kind of neutral to that. But didn't oppose it then? Didn't oppose it. And somehow the lawyer wasn't aware that that order had been granted? He wasn't. He relied on an associate. The record shows a junior associate, a lawyer, to contact the clerk... By telephone. By telephone. The clerk gave him the wrong information. And finally one day it was a she, and one day the clerk, she, gave the attorney, she, her, the information. Oh, it was denied. And nobody checked the paperwork. Nobody followed it up. Nobody ever saw the paper. Nobody knew about it. The case goes on to trial, and I discovered as the appellate lawyer, that's my stock and trade for a whole lot of years, when looking through the record and seeing something that didn't make sense and following up on it. That's where it was discovered. The interesting part about this case is it went up on appeal, and the appellate court affirmed part of it, but then it remanded it for basically an evidentiary hearing on a sleep study. So then it went back, and a sleep study was performed. It was. And there was substantial testimony about what the sleep study indicated. A full day. And the court took a look at that and said, yeah, okay, start with we'll agree that there was a mistake here, but there isn't any prejudice, and then the court goes through a long explanation of why. And we're confronted with what sometimes is called double deference. Yes. Because the court said no prejudice. And so we have to, it not only can't be something that we just disagree with, but we have to think it's unreasonable. I mean, we have to go to the end of the intellectual earth to come down in your favor. Well, not quite. Okay. Because we have in the briefing suggested that only the single deference of the prejudice rule as contemplated by Strickland and applied by other Supreme Court cases showing a reasonable probability of a more favorable result, which is translated not in terms of outcome determination, but simply that an error by counsel was so, was likely to undermine confidence in the verdict. And we have pointed out that in that respect, the judge, the Superior Court judge, whose reasonable or unreasonable application of Strickland and its progeny, this court decides now under the Richter, Harrington v. Richter. That was originally my case, Harrington v. Richter, before it went in banks. So I've taken a look at this and what in the actual sleep study is so important that it suggests that it would undermine the verdict in this case? The sleep study wasn't all that remarkable. Well, it showed two things that I thought were very interesting. I learned for the first time that sleep studies of people who sleep normally show that some 80 to 90 percent of the time we are in bed, in a sleep mode, going to bed, going to sleep, and then awakening. 80 to 90 percent of the time we're sleeping. But some people don't have that as much. And at least one of the days, Mr. Liao had that, had a number 60. That's a considerable percentage lower. And you will recall from if you've read the hearing that Dr. Ehrman, the San Diego psychologist and expert sleep study, relied on papers and research by another Stanford professor named Gimeno, which is, I think, as good as well as I can pronounce French. It has U's, I's and L's in it. None of them seem to be part of the pronunciation. But Dr. Gimeno has numbers to show that that's significant. And the point of mentioning that factor, and of course, I will acknowledge to make the point complete, Dr. Ehrman said that number 60 could have another cause or partial cause. And that other partial cause could be he was in shackles. So it may have made his sleeping more difficult. He was in what? Shackles. He was shackled. When they studied him, he was like in jail. He had a sheriff there. He was in handcuffs and so on. But Dr. Gimeno and Dr. Ehrman also indicated that Mr. Liao had something the jury didn't know about. He had sleep apnea. Now, that's something we didn't know as younger folks. None of us had ever heard of it. Now even lay jurors have heard about it. And it's a terrifying phrase. It's a phrase that says sleep is dysfunctional, one of the most important things to all of us, eating and sleeping. And it is a disease, a disorder that affects people in very serious ways. And this jury heard none of it. But didn't the doctor from Stanford or the expert from Stanford who testified say that he didn't care whether there was a sleep study or not? This is my opinion. Wasn't the jury presented with already? You're referring to Dr. Klee Kushida. Kushida. And let me say what happened with Dr. Kushida. And it was a disaster. He is one Stanford expert that's not OK, right? I'm not a Stanford man. At this point, everybody from Stanford came in with a 4-0, right? That's right. That's right. That's right. So we got the two sides of Stanford. I hope we don't have any Stanford men here on the panel. But if so, well, I know you're past that. Dr. Kushida said the way to do it, the way to know if he has a sleep disorder is for me to, one, examine him. And if I examine him. That's a diagnosis. That's a diagnosis. And see that there is a potential sleep disorder. Then, number two, I need to do the sleep study. And I need to do them both in the jail. I hope that is clear. Mr. Liao is in custody. He's not able to go to the Dr. Kushida's office or to Stanford. He's in the Huskow. And someone needs to go and look at him. And you don't get to look at him. It was then Mr. Pitchess's facility. But we have a new sheriff. But it's the same thing. You don't do that without a judge saying, here is an order that I'm signing saying this man, this doctor, this Stanford guy, he has my permission to go and do a look at him and a hands-on and, in fact, to do a sleep study. The whole nine yards was authorized by the commissioner, the court commissioner, but never known to Mr. Donahue. And as a result of that, it wasn't done. So here's Dr. Kushida trying to do what he was paid to do, no doubt. He was certainly called on that, as I recall. There was a sleep study done, was there not? No, I'm talking about the first one in response to the question about how this started out and what the jury heard. And this is all important, Your Honor, because the jury never heard what you're just asking me about. Not a thing. Not one thing. They did not hear about Mr. Liao's number 60. Shackled or not, whatever the explanation, they never heard 60. They never heard sleep apnea. What did Kushida testify about? He said, well, I talked to his family. Sleep disorders run in the family. He told me what kinds of problems he had. He was a sleepwalker. And to me, that's consistent with being a sleepwalker. So he ends up on the stand, kind of coming up from the higher hill that you would expect of an academic, to sort of the lower, giving the defense attorney what he wanted. But boy, that prosecutor didn't let it stand at that for long. She was right there saying almost the first question. Now, didn't you say that you have to do an exam and a sleep study to be able to diagnose this, to be able to say this? Well, yes, but. Yes, but became the trademark. He said he had an opinion. Yes. Had an opinion that this individual was a sleepwalker. Yes. But he wasn't able to make a diagnosis because he didn't have the opportunity to examine, and he didn't have a sleep study. And then the cross-examination occurred, which was very effective as far as the doctor, Yoshida, was concerned. And he just kind of backed off. Backed off. And couldn't say anything more than he just had an opinion. It was not his diagnosis. And that was the way it was. And then what happened? The prosecution had a rebuttal witness. Sharma? Dr. Sharma, the famous Dr. Kazel Sharma. And Dr. Sharma, who appears in many of the cases and may be a familiar name, he said, you've got to have, you can't diagnose a sleep disorder without a sleep study. He immediately backs off and says, of course, I'm not an expert. I'm not a sleep expert. I can't do that. But I've read in the books. I know this is the case. And is he a Stanford guy too? Oh, who knows? There were two sleep studies. Am I right? No. Oh, there were two nights of sleep study by Dr. Ehrman after the trial. Right. And then the second one, there was no sleep disorder, which used to be called apnea. Now they're calling it just plain sleep disorder. But there was no apnea. They didn't show signs of it. It was pretty darn normal, the second one. Well, you're the defense attorney in front of the jury. And you have that kind of testimony that Dr. Ehrman gave at the habeas hearing, which our jury never heard. And you say to the jury, you know, we had this study, and it had this, and it had the low point on the first day, and the second day looked much better for him. What do you think, Dr. Kushida? What do you think, Dr. Ehrman? And you would get a different perspective on it. And then what happens? We do what we do best in the American system of justice. We let the jury decide whether it matters or not. We let the jury decide whether it may have affected him in some way, whether it may have affected his state of premeditation and deliberation. My gosh, I think that we challenged that on appeal unsuccessfully. The habeas level, whatever. Well, I'm talking about mixing the two, and the thing that is important to remember, let me be sure I say this at least once about mixing the two. After Strickland, the two leading cases by the U.S. Supreme Court were Williams v. Taylor and Wiggins v. Smith. They came well before Richter, and they're still good law. And both of them say that in assessing prejudice, you look at the evidence at the evidentiary hearing as well as the trial. The prejudice at the trial is assessed from both the evidence at the trial and the evidence at the evidentiary hearing. Any questions, any concerns about that must rise and fall on that premise. And the judge, we contend, unreasonably applied those three cases when he never once considered how the effect of the jury hearing anything about sleep apnea, anything about Dr. Ehrman's findings at the evidentiary hearing, because the jury couldn't have heard it. No sleep study was conducted before the trial and verdict. And it is extremely important in assessing prejudice that this court bears that in mind. Now, there is in the record a suggestion, another problem, which we have pointed out that bears directly on your question, Judge Trott, as to why it makes a difference even with the second day's more normal reading. And that comes from the line of cases exemplified by the two that we highlighted in our appellant's reply brief. We cited them, of course, in the opening brief, Brown and Luna. I don't remember the warden's name in either of them at the moment, but they are discussed in our reply brief. And both of them make the point that in considering prejudice, evidence that would confirm or corroborate, and I think the word corroborate is used, the credibility of a witness is part of the determination of whether there was prejudice from evidence not before the jury due to counsel's deficient performance. And under those cases, what Dr. Erman said would corroborate what Dr. Kushida said without the test. In other words, Dr. Kushida's testimony that the prosecutor assailed because it wasn't backed up by a sleep study, and he was just protecting himself to give an opinion as a prosecutor cross-examined. That Dr. Sharma said. Diagnosis. Yes, diagnosis. Not as an opinion.  Thank you. And it is a diagnosis. And Dr. Sharma's opinion that you can't make such a diagnosis of a disorder without the test, that evaporates. It doesn't disappear, but it evaporates. The jury does get to hear it, but it is diminished by the fact that Dr. Erman, having done that, corroborates Dr. Kushida. And it becomes a more even match. Instead of Dr. Kushida being punched down, nothing to support it, Dr. Sharma saying that's ridiculous, and the prosecutor building her case on that, they're two equal folks in terms of credibility. Kushida, it doesn't look like he's just there for the money. He's really legitimate. And that is for the jury to determine, and that's where we stop. Because we don't go the next step of deciding whether it would have resulted in a different outcome. We only decide does this undermine confidence in the verdict the jury render. A subtle, but very important, frequently repeated part of the Strickland analysis. Well, it seems clear to me that the fact that the defendant didn't undergo a testing, certainly hurt his case and resulted in some very damaging cross-examination. And so if you had to wrap your argument up in two minutes, what would you say? Well, I would say that the state mostly agrees with us. The state mostly agrees with us. The state, as we have discussed in the briefs, doesn't argue we can't make double deference. They do not argue Richter to their credit. The state argues the cumulative nature of Dr. Kushida's, Dr. Ehrman's, the second, And that is what this court really must decide. What is cumulative? And we have suggested that it is not cumulative. Well, what relief are you asking for? Well, the granting of the writ that was sought in the district court would set aside the entire conviction and judgment and return the case to the Superior Court of Los Angeles for a new trial. Mr. Liao, to his credit, served his sentence, his life sentence, admirably, was recognized for his good conduct and released on parole early this year. His ability to remain in this country and to continue his life depends on his not violating parole, of course, and he won't. What's his immigration status? I can't, it's certainly not in the record. My understanding is that he will not be able to stay. That was my recollection of an assumption, and I could be wrong. And because he is here today, we could actually find out, but I don't think that would do us any good. This court, at the time, he is still in constructive custody. Habeas is still proper, but it was proper, of course, he was in prison when we filed all this time. He paid a heavy price for his lawyer's mistake, and being able to achieve what I suspect will be a much more moderate disposition when the matters returned on retrial would be certainly the best thing in the interest of justice, let these folks go on with their lives just as everybody else has, and a good solution which balances the interests of the prosecution and the defense. Thank you. I hope I can reserve a minute or two if there's some need afterward.  You owe us time. I'm sure I do, but perhaps this case is for—I was just going to say, if this case has some importance compared with the $51 million I heard about earlier, if there's something really important, maybe we can—I appreciated the court's time. Thank you. We're going to take a brief recess. Court is adjourned in a short recess. Looking at the clock, waiting for it to pass, it's still quarter to eight. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. This is a test. This is a test. This is a test. This is a test.     This is a test. This is a test. Good morning. I think we are still in the morning. Good afternoon. California deputy general Ryan Smith.  rejection of the claim for Marise Junius. The district court properly rejected petitioner's claim of ineffective assistance to counsel because petitioner failed to demonstrate that the California state court's rejection of the claim was either contrary to or an unreasonable application of Supreme Court precedent. During a postconviction contested evidentiary hearing, the trial court reasonably determined that petitioner was not prejudiced by counsel's failure to conduct a sleep study. And there's really several important reasons for this. First and foremost was that when the sleep study was conducted prior to the evidentiary hearing, the sleep study's results were underwhelming. There was nothing in the results that would actually say that petitioner was a sleepwalker or that he possessed this trait. While a couple of the results indicated a low sleep efficiency rating, Dr. Ehrman himself testified that those results could have been the fact that the petitioner was shackled and in jail. Excuse me. Had the prosecution... But this was all after the conviction. Yes, Your Honor. And Dr. Cushito was... His credibility was... pretty much destroyed by the cross-examination. Yes, sir. And the fact that he said, well, that's my opinion, but I... But he wouldn't make a diagnosis because he hadn't examined the patient and he hadn't... And he hadn't had the benefit of a study. Yes, Your Honor. Well, two points. First, the question here is whether counsel was ineffective for conducting a sleep study, not whether the doctor had examined the petitioner. The second point is, if from the results of the actual sleep study were presented to the jury, the prosecutor would have easily curtailed or used those results to equally discredit the doctor about the petitioner being a sleepwalker. Well, we don't know. We don't know about that because we don't know what the study would say. It was not done. I understand it wasn't done at that time. It's kind of crazy that it wasn't done. Apparently it was asked for and the judge granted the request and somehow they got the word that they thought the request had been granted. I didn't bother to check any further. The judge didn't say anything. That's kind of strange, too. Yes, Your Honor. I mean, clearly the sleep study, the attorney should have known, the defense attorney should have known that the sleep study was granted. You've conceded the first prong of Shrekland is met. Well, the parties at the evidence hearing stipulated to that fact. Personally, so yes. So the first prong of Shrekland is met. So we're only discussing the prejudice. Is your point now that we have the sleep studies, if we look at them carefully, we'll see that the sleep studies themselves would have been used to destroy Dr. Kushida? That's absolutely correct, Your Honor. That's your point? Yes, Your Honor. But we don't know whether that would be true or not, though, because Dr. Kushida has never been asked about the sleep studies, correct? That is true. He has never been asked about them. But if Dr. Kushida is able to say, you know, I'm diagnosing him at this point in time that he is a sleepwalker, well, two things. First, if they introduced the sleep study results, those results did not show that he was a sleepwalker. Well, we don't know that, though, because we're not experts. Dr. Kushida is the expert. He might look at the sleep study and say, I don't know, because we're speculating now, could, could not. He might look at that and say, this 60% efficiency rating or whatever I'm looking at absolutely confirms my suspicion or opinion that the guy is a sleepwalker, and therefore, blah, blah, blah. We just don't know what Kushida might say when he looks at the sleep study. To us, it doesn't look all that great, but we're not Dr. Kushida. Correct. And the prosecutor seemed to believe in the trial that this was very important evidence because he used the absence, she used the absence, the clobber, the expert witness, who was really the key witness for the prosecution, clobbered him. Correct. Well, the point would be that still that the evidence of a sleep study, which is what we're looking at here, whether the absence of that prejudiced the petitioner in this case, and because the results. It did in the trial. It did in the trial because it was absent then. Right. But now looking back, I think you have to look at both what the actual sleep study shows and apply that to the case the best you can. I'm unsure because if we look at the trial, it did prejudice. Correct. And so now we're supposed to say, well, now that we know what it is, he wouldn't have been prejudiced. Correct, Your Honor. It's a strange combination. Yes, it really is. In this case, it's a strange combination of how the two are having to work together to determine or not whether it was necessary for a sleep study to be introduced. I don't think this is cumulative if you look at the trial because corroboration was the key element. I mean, I tried a lot of cases, and you ain't got corroboration. You're outscout on a lot of this stuff, as was Dr. Cushita and Mr. Liao. I understand the concern about whether it's cumulative or corroborative. You ever tried a case? I have not, Your Honor. You think this was really cumulative if you look at the trial? It wasn't cumulative at all. It was like a gangrenade. Excuse me. I'm sorry. I didn't mean to cut you off. That's okay. It's my fault. The only reason why I believe that it was cumulative was the fact that there was other testimony besides Dr. Cushita that Petitioner was a sleepwalker. Petitioner's ex-wife testified that he would wander around the apartment. Lee, the victim's mother, in this case, testified that Petitioner was sleepwalking around. That testimony really was not attacked like it was with Dr. Cushita. So even the fact that Petitioner, just give the fact that Petitioner is a sleepwalker, that the evidence of that doesn't determine whether or not he was sleepwalking in this case at that time. Well, I don't know. If you look at exactly what happened, factually, when he hit the kid with the hammer, it appeared to me that he was in some kind of a state, according to the evidence. Correct. Or it could be interpreted that he was in a state of rage instead of a state of- Well, he didn't look like a state of rage. He continued to whack the kid, and he didn't. He looked like, what's happening? Yeah. He did stop after three hits when the victim jumped up. Move closer to the microphone. Yeah. Yes. He did stop the attack when the victim jumped up out of bed and moved away from him. And how did the victim say he appeared at that time? He just said he appeared like not himself. Right. Right. But that could equally be that not himself is, what does that really mean? It could mean that, but it could also mean it was a state of rage. And I think given everything leading up- But then he said, don't call the police. Correct. And there was testimony at trial that from the- Where's the rage? I mean, it seems to have dissipated almost like that. Correct. I mean, I understand your Honor's point, but I think that the fact is there was testimony at trial from an expert psychologist that petitioner's behavior after the trial showed he was trying to actually-he knew what he was doing, stopped and immediately started to cover his tracks by telling the victim to tell the police that he fell down the stairs. He would not talk to the-he didn't want to call the police for Lee when she instructed him to do so. Yeah, he just whacked the kid on the head with a hammer. Correct, Your Honor. Exactly. And he knew what he had done. Well, maybe, maybe not. Maybe he didn't know what he did. I mean, he discovered what he had done after he woke up from the episode. I'm looking at the facts here now. And then he was like, oh, my crime. And he just smashed his head. A glancing blow. He didn't hit him right with a- Well, he hit him three times with the hammer, Your Honor, and it caused-he had to have staples put in his head. So he did strike the victim. It wasn't-maybe it wasn't enough to kill him, but it was a serious enough strike to draw blood and require staples being placed in his head. What other evidence did the court have about the defendant's prior conduct? Yes, Your Honor. Prior to-approximately two weeks prior to the incident, Lee had broke up with Petitioner, and Petitioner hadn't taken this very well. He had been continually trying to get back together with Lee. Five or six days prior to the incident, Petitioner came- Was this violence? Was that some sort of aberration on the part of this defendant? Or did he not have a history of that? He had actually a history of it. There was evidence that he actually had kicked Lee before from-Petitioner's ex-wife had testified to that. And what I was getting to was four to five days prior to this incident happening, Petitioner came to Lee's house and was trying to get back together with him. A fight ensued. Lee tried to leave the residence. Petitioner blocked the car, and Petitioner threatened to kill Lee's family. Who testified to that? At the preliminary hearing, on cross-excuse me, Lee testified- You know what I'm getting at. Yes. Go ahead. But Lee testified at the preliminary hearing that Petitioner threatened the family. At trial, Lee changed her story. It was a joke. It was a joke. However, in the trial court's opinion, at the evidentiary hearing, he specifically addressed the reason why Lee changed her testimony because she saw that Petitioner was in serious trouble and the injuries to her son weren't as serious as she originally thought. And the trial court had made that finding. And what did the habeas court find? Which habeas court? The district court? Yes. The district court also found that there was evidence that Lee had changed her story for a different reason. So the reliable testimony was at the preliminary hearing, not at the trial? Yes, Your Honor. Exactly. So the facts leading up to the case in this situation. So we had the incident four or five days prior. The day of the incident, Petitioner is returning Lee's car. Petitioner stays at the house for some reason. Petitioner gets into another argument with Lee. Lee's like, you know, whatever, I'm going to bed. She leaves. Petitioner is wandering around the apartment awake. He's seen awake. Go ahead. Yes. He's seen awake. He's never seen asleep before this. There was no testimony that Petitioner was ever asleep prior to this actually happening. He's in Lee's apartment. Petitioner doesn't live there anymore, but he's still hanging out in the apartment. And then at four o'clock in the morning, he attacks Henry, Lee's son. So he was awake the whole time? He was awake the whole time. There's no evidence he was ever asleep. Was there any evidence that he was awake from midnight until four in the morning? There's no evidence he was awake or asleep at that point in time. And before this incident, any indication of sleepwalking? Yes. I mean, Petitioner's ex-wife had testified that when she was with him, he had done some sleepwalking. Lee had testified when she was with him, because she'd been with him for a few years prior to this incident happening, that he'd wander around and didn't seem to do that type of thing. Go ahead. How much time elapsed between the trial and the sleep studies? I could look. I'm not exactly sure on the amount of time. Years? Yes. It had been a while, yes, Your Honor. That strikes me as maybe these sleep studies don't mean anything if they were conducted that much later than at the time of the incident or the trial. That's true. Also, Your Honor, it may not have meant anything. And I get to your point, well, it should have been. That's another reason why maybe it should have been done at that time. If it's done so much later, I mean, it could be dismissed as, well, what are you talking about? That's years later. It should have been done at the time. This guy's been in custody, you know, in a different kind of a setting. I just don't know, you know, whether Cushita's going to say that's useless because it's conducted so many years later. Correct. But that would have to determine whether or not, once you're a sleepwalker, are you always a sleepwalker, that type of situation. And I can't answer that, Your Honor. Yes, sir. Well, tell me in the record when sleepwalking first raises its head as a defense in this case. The sleepwalking raises its head when defense witnesses are called about petitioner's daughter, petitioner's ex-wife. They testify that petitioner. Just to cut right through it. Okay. Is there anything in the record that would indicate that he was not a sleepwalker? No. All the witnesses said he was a sleepwalker. Yes, Your Honor. Whether it was a result of a sleep study or observation, the guy was a sleepwalker. Yes, Your Honor. Whatever that means in the defense of this case. Correct. He was a sleepwalker. He was a sleepwalker. And whether he was sleepwalking at the time or not is a question that's been resolved by the habeas court. Is that right? That's correct, Your Honor. Okay. Yes, Your Honor. Thank you. Unless the court has any further questions, we ask that the court affirm the district court's ruling. Thank you. I have one thing, if I might add, and only one in response to the last dialogue. As I recall, the superior court judge, the trial judge, at the end of the evidentiary hearing, he remarked that something along the lines of the sleep study not being dispositive of really strongly proving that there was a sleep disorder. Same kind of thing that has been discussed for some time this morning. But the judge made a comment, and it's on page seven of his findings, which I believe is ER 25. And there he said it would have been a different case if the sleep study had shown a stronger form of sleep deprivation and sleep disorder than it did. In other words, the judge was saying the evidence is not overwhelming and the evidence might have made a difference to the jury. What was the judge's name? Do you remember? Yes, Robert Martinez, a longtime deputy district attorney, and I think he became an executive, and then a superior court judge in Pomona. That goes to the weight and not the fact that the issue was before the jury, right? Yes, it does. Okay. And the weight is what is critical because the jury never heard that, as I've made the point. It never assessed the credibility of Dr. Kushida with the basis of the evidence that came out at the… Go ahead. I just want to ask… Well, many times when we have these matters, criminal appeals, the probation report is in the record. If you're asking, Your Honor, about priors and prior convictions and problems with the law, the answer is no, they're not there, and they weren't in the probation report for the appeal. But what is here before us today is the evidence that the jury isn't part of the appeal because it wasn't part of the trial record. So, in effect, we're going on the habeas corpus record, state habeas. I'm talking about time he was sentenced. Yes. I wondered, the sentence seemed rather severe to me. It was mandatory because of the great bodily injury finding. By then, this was 2003 or so. The sleep study was 2008. It was five years later, as Mr. Ryan answered. By then, the law was, if you have a GBI, as we talked about, if you have certain findings, attempted premeditated murder, there is no probation. It's mandatory. The assault charge that was also included would have had probation eligibility if it was there alone. It's a mandatory life sentence. Yes. Minimum seven years, maximum life. That means at least seven years before parole eligibility. They did what, ten? I mentioned 11 years is my understanding, and I do want to correct the record, although it's completely- It's a minimum seven years? Yes. Then eligible for parole? Yes. So the sentence is seven to life, or life minimum of seven. That's because of the premeditation finding. And I do want to tell- How long has he been in custody? He was in custody 11 years in prison. He was in county jail before that several years, so he was in custody about 15 years total, and he is now in constructive custody on parole for three years. And I do want to say I've learned that he is a citizen of the United States and has been for 30 years, and so this is not in the record. The court asked the question. The same ultimate goal or remedy that I mentioned about reconsideration at the prosecution level if a writ is granted and a more reasonable disposition will have a number of other benefits that are very substantial. But that's the case anywhere. It's nothing new. And I thank the court for its time. All right. Thank you. Thank you. The grandchildren are still awake. That's good. Now they're going to go to dental school. Pulling teeth is easier than this, right? They'll go to dental school. Nice to see both of you. Good to see you all. Thank you, and the court stands adjourned.
judges: Stafford, Pregerson, Trott